Before we begin, I'd like to make an announcement. As you may notice, Justice Hoffman is not here with us this morning due to prior judicial commitment. He will not be here this morning, but he is a fully participating member of this court and fully participating in each and every case that will be heard today. As you are aware, the oral arguments are recorded and are available for the public to listen, and so we all have access to the oral arguments, and of course the court has access to the record and the briefs. So he will be participating in the decision in each and every case this morning. That being said, counsel may proceed. Please support Mr. Wertz. My name is Bruce Beshore and I represent Ronald Summers, and Your Honor, speaking about the recording, I remember the good old days when you could come here and sometimes you'd have a bad day. Your mouth's just not working. It's a physical thing, but that's okay because once you walked out the door, it was all over. It's not that way anymore. You have a bad day. It lives forever. Your client can hear it and everyone else. And we constantly remind ourselves that that's a possibility in the public as well. Yes? Well, the arbitrator denied this claim, and the commission affirmed and adopted, and the circuit court confirmed it. For reasons that I'll go through this morning, this case cannot stand. It's against the manifest way of the evidence. The conclusions of the commission in several instances are without any basis in the record, and in places the commission is simply wrong as a matter of law. To draw the ballpark, there are four diseases on the table. Pneumoconiosis, COPD, emphysema, and asthma. The last three are all related, COPD being the umbrella term that includes both emphysema and asthma. Now, a claimant doesn't have to prevail on all four of those diseases to escape the denial. Anyone is sufficient. Therefore, I'm going to start with the obstructive disease. It's not the CWP. Now, the commission was in error to put more reliance on Dr. Repture than on the other experts in the record. First, the commission noted that Dr. Repture testified that the PFTs of Dr. Hauser were normal and that his own PFTs were normal. Both those conclusions are false. Dr. Repture did not say that his PFTs were normal. He said that the flow volume loops suggest mild underlying COPD. Based on this error alone, the commission's denial should be reversed. Dr. Repture was also wrong about the PFTs of Dr. Hauser. Hauser explained that his PFTs showed mild COPD, which was probably an early stage of emphysema, and Hauser testified that under the AMA guidelines, 6th edition, spirometry can't be normal unless the ratio is more than 75%, and the ratio of his testing was 68%. Hauser also noted that Repture's testing gave a ratio as low as 59%, which was an obstructive impairment. Dr. Hauser's evaluation of his PFTs were based on recognized authoritative standards. Dr. Repture had no basis at all. He even admitted that his PFTs did show an obstruction. Regarding Dr. Hauser's opinion that early COPD has no clinical significance, Dr. Hauser said, quote, well, COPD is COPD. It's a progressive condition. As time passes, it's likely to become more severe and therefore clinically significant, and that prognosis came true with the 2013 testing of Dr. L. Scherbini, which showed that it had progressed to a moderate obstruction with a significant reversibility. But Dr. Repture wasn't finished being wrong yet about his findings of COPD at this exam. Repture's physical exam showed diminished breath sounds, and both Repture and Hauser testified that's consistent with emphysema. Repture testified that they were specifically consistent with emphysema. And for the final nail in the coffin, Dr. Repture ordered a CT scan of the chest as part of his exam, and his own radiologist read the CT as showing emphysematous change. Now, when he was confronted with that finding, Dr. Repture, he said, I've never heard of that word before. When told that the report said, quote, lungs mildly emphysematous, Repture said, quote, he just made up a word. Well, that's his own radiologist talking about. Then Repture's problem got worse because Dr. Meyer, an American bee reader, also said that the CT showed emphysema. So the commission relied on Repture's opinion that his exam was normal. No COPD or emphysema, but Repture was wrong according to the AMA guides, Dr. Hauser, Dr. Repture's physical examination of the chest, Dr. Repture's full reading of the PFTs, Dr. Repture's radiologist's reading of the CT scan, and American Poll's other bee readers' reading of the CT scan. In other words, not only did Dr. Repture not show an absence of COPD or emphysema, every single aspect of his examination proved it, and every other coal company expert that reviewed the CT documented it. The commission finding that Dr. Repture's and Dr. Hauser's PFTs were normal was false. The implication that Repture's testing showed an absence of COPD and emphysema was also completely false. The commission finding was against the manifest way of the evidence and was wrong by every conceivable measure. And there's more. And this goes to the basis of the commission's decision. Dr. Repture said that he was aware that the official positions of the American Thoracic Society, NIOSH, and the Department of Labor were that mining could be as great a risk for COPD as smoking. And his review of their positions was that they were absolutely insane. They had zero evidence. They don't cite any evidence in the literature from any source, that they aren't worth the paper they're written on, and that their data was horribly inadequate, and that they didn't account for smoking, even though they were comparing smoking and mining. So, sir, let me ask you that, because I was about to. Other than Dr. Hauser and Repture, is there any evidence in the record that the other professionals had considered the claimant's smoking habits when giving their opinions? I'm sorry, I couldn't hear the last part. Other than Repture and Dr. Hauser, was there any evidence in the record that the other experts considered the claimant's smoking history in giving their opinions? Let me try to think about that. We know that Hauser did. We know that Repture did. We know that they all knew that he had a smoking history, so if they know it, I don't know how they could leave it out. I didn't see it. And in kind of reshaping that question, if you'll allow me, I would go back to say that the question is always not, what did smoking do? It's, did mining do anything? Right. And that's kind of a trap that a lot of doctors get caught in, and sometimes the Commission does too. So, is that okay? Yes. Now, oddly enough, oddly enough, what makes the Commission's reliance on Repture beyond redemption is its testimony that, in fact, if the positions, he said this, if the positions of the American Thoracic Society, Department of Labor, and NIOSH were correct, that coal mining is as great a risk for COPD as smoking, you couldn't rule out coal mining as a causative factor in this minor COPD. Repture made that. So, it comes down to the Commission, well, do you think the American Thoracic Society, NIOSH, and DOL have any legitimacy? If they do, the petitioner's in. If not, he's out. In other words, for the Commission's decision that Dr. Repture was right to stand, all of these would have to be wrong. The position of the American Thoracic Society, the position of the Department of Labor, the position of NIOSH, the expert opinion of Repture's radiologist on the CT scan, the expert opinion of American Coal's expert, Dr. Meyer, on the CT scan, Dr. Hauser, and Dr. Repture himself. And here's a list of other evidence in the record that found COPD or emphysema. Bee reader, Dr. Alexander. Bee reader, Dr. Smith. The radiologist who read the chest x-ray for treating doctor, Dr. Donnie Shelton. Dr. Patrick Murphy, who examined the claimant in Tulsa. The treating records of the Warren Clinic. The treating pulmonologist, Dr. L. Sherbini of Heartland Regional Hospital. And the treating doctor, Dr. Eric Graham. And that's not all. Dr. Repture also testified that COPD can be multifactorial in origin. And that when it is, the components are additive. And that kind of goes back to the smoking question. Multifactorial and additive. And that the existence of smoking affects COPD but doesn't rule out contribution from other factors. And that it's possible, he said it's possible for coal mine dust to cause COPD. Now, oddly enough, there's a part of the testimony where Dr. Repture was talking about some of the literature and he actually said mining always causes a little obstruction. But that smoking causes catastrophic disease in 13% of the smokers. Now, I don't care about the smoker part. What I do care, he said that mining always causes a little obstruction. In this case, both can be applied. Mining can be causing a little claimant's obstruction. And since his obstruction is not catastrophic, he's just not the 13% of those unlucky smokers. Another piece of Dr. Repture's testimony removes any rational basis from the commission decision to give him the most credibility. He said that PFDs show the type and severity of a breathing problem that's not its cause. And I think this is very important at this level where I'm attacking the basis for his opinion. If he's saying that smoking and not mining, he has just told you the only testing he has can't tell you whether it is or not. There's no objective basis for a commission conclusion that coal mining is not a causative factor in claimant's obstruction. And one last point on the COPD emphysema. The radiologist for the treater, Dr. Donnie Shelton, read claimant's x-ray as showing emphysematous changes and hyperinflation suggestive of early COPD, and he did it four years before this man left mining. While he was still mining, he had that diagnosis. Now, the commission didn't address this, but concerning the diagnosis of asthma, both authorities, Dr. Houser and Dr. Repture, showed a significant increase in the FEV1 after bronchodilator, and the most recent testing of Dr. Elsher-Biener showed a great increase which would find asthma. Now, just a little bit on co-worker's pneumoconiosis. I say the commission was wrong as a matter of law in its conclusion that claimant has no CWP. I don't want you to re-weigh the evidence. That's not what I'm asking. I ask you to look at the evidence which the commission weighed and find that some of that evidence cannot be included in the weighing process as a matter of law and reverse the conclusion of the commission. The commission found that... You say some of that evidence cannot be. Is there some evidence that could be? There absolutely is. But when they say I take into consideration A, B, C, and D and I come up with this, if one of those is wrong, I say they need to weigh it again. They may weigh it again and kick out the one that shouldn't be in there and come up with the same, but we have what we have. Are you asking for a remand to say you can't consider C or D because as a matter of law it's not permissible? I'm asking for a remand. That would be a good part of it. Okay. And particularly since this issue comes up time and time again, this isn't the only time it's heard. The commission found the reads of Meyer, Wyatt, Castle, and Nyash more credible than those of Smith, Alexander, and Coyne. And I say that's wrong as a matter of law. It's also against the manifest weight of the evidence. The Nyash x-rays, those surveillance x-rays they take during their career, those were taken in 1979 and 2005. Now, the legal question before the commission is did Clayman have pneumoconiosis manifesting itself on x-ray within two years after he left the mine? That's his timeline. It's got to show up then. And all the witnesses say that pneumoconiosis can show up first after the guy leaves the mine. Now, so at the time of the first Nyash x-ray, Clayman still had 31 years of active underground coal mining left to develop his CWP. At the time of the last Nyash x-ray, he still had five years of active mining left plus the two of the section 1F period. Even if both Nyash x-rays were completely correctly read, they wouldn't answer the question of whether this man had CWP when he left the mine or within two years after he left the mine. They're simply too early. And I believe it's wrong as a matter of law to include that. How much influence that had on them, I don't know. They didn't say. Mr. Messore, from a procedural standpoint, I'm curious how this would work because that would have great implications in many workers' compensation cases where on appeal a claim is made that a basis for an opinion was invalid as a matter of law, but that was not objected to at the time of arbitration. Why wouldn't it be a matter of forfeiture on the part of the party objecting to the basis where an objection was not made at the time of arbitration or a motion to exclude some type of motion hearing at arbitration so that it could be, if it were legally invalid, excluded at that time and then the expert then would be faced with either opining on the remaining basis or not being able to express that opinion. When it happens on appeal for the first time, what you're suggesting here is we can't accept the remaining basis as sufficient to support the opinion and it would have to be remanded. In civil cases, certainly we don't do that. The issue of forfeiture is what controls there. How can we do this on appeal? One of the great things that Ken and I have to face is we come up with a beautiful idea. We institute it at arbitration. Five years later, we find out what you say about it. In the meantime, 200 cases have gone by with that error or not error in it. I can tell you that I always object to these things in the past and every time I make an argument, I say it shouldn't be in there because to me, this specific thing stands out. Now, going back, I know there was a time when I always objected to the arbitrator even putting them in. I was never successful. I don't know how many years I did that. It may be that after them saying, oh, no, we're going to let it in, I didn't object, but I raised the argument. So I can't tell you in this specific case what I did at arbitration when the evidence came in. I can tell you there were years when I objected every time and I never prevailed. But now it's important at this level. So I have never left out a step of objecting to knowledge. Another factor to keep in mind here. See, the red light came on. Am I correct? Yes, yes. You're not only correct, but that's immersive. Thank you. Well, you'll have time in reply. I had that in mind. Thank you. Counsel, you may respond. May it please the Court, Mr. Wusserwerth. My name is Ken Wertz and I represent the Appalachian American Coal. I hurriedly looked. I saw you. I was trying to hurriedly look and find that for you. And, again, I can't tell you this is all there is. But with Dr. Let me find it here where I marked it. Dr. Shelton, his records were all we put in. We didn't take his debt. And in the records from Dr. Shelton for an office visit of August 17, 2006, I think that may be his first office visit with this gentleman. I don't recall. He records his smoking history and one of his diagnoses is tobacco abuse. I think that touches upon what you were asking for. His smoking history, is it relevant or is it somewhere inherent? Well, I'm glad you asked that. When I defend these cases, the first thing I do is I try to determine, does this man have an occupational disease or not? And that begins with looking at the chest X-rays, having them interpreted, their interpretations, that type of thing. And then from there I move to, okay, does he have a disability as defined by the act? And if he has a disability that's arguably could be due to work or could be due to other causes, I then look to see, are there other explanations? And the ones that I commonly look to are cardiac, because they affect your breathing and your exertional ability. Smoking history, obviously, the same symptoms can occur with that. Perhaps obesity, if one's morbidly obese, it's going to affect your exercise tolerance and make you short of breath with exertion and that type of thing. And then if something in those areas and there are others are there, then I try to pull the string, get the medical, and see what the medical says. I'm doing that not in the end to prove to the commission or to Mr. Seward or to you that this gentleman's problem is due to something other than his occupational exposure. It may seem that way, but that is not what I'm doing. What I'm doing is trying to get all the facts and all the evidence so an analysis can be made as to whether what is happening with this individual by a preponderance of the evidence can be said to be due to his work exposure. And so I don't know if that directly answers your question or not, but in the end the issue, and it's in this case, obviously, has the claimant proven by a preponderance of the evidence that he has a work-related disease and a disability? In regard, if I could go on, in regard to the issue, first of all, of pneumoconiosis, the commission found that the interpretations of Dr. Meyer, Wyatt, Kassler, and Niash were more appropriate. That's their job. They made that determination. I can stand up here and rebut all the things that Mr. Wisora said, but then I'm arguing the facts again. They did their job. They made that determination. In regard to the Niash films, I just want to point out that not only did my expert look at them, and you're questioning about objecting, Mr. Wisora's expert looked at them too. So, you know, and what's important about that is both of his, well, Dr. Smith and Dr. Cohen, both interpreted the Niash films of February 17, 2005. They both found them positive for pneumoconiosis. These are the films that Niash interpreted as negative. Dr. Smith then continues with that same interpretation for all the later films. So, obviously, that calls into question if he's seen something in February of 2005 and he continues to see the same thing thereafter. And Niash says those films in 2005 were negative. We have an issue, obviously. And that was the reason why I did it. That's why I got those films and actually asked my readers, put them up there side-by-side and look and tell me, are there any changes in these films? But to answer your question about objecting, his experts looked at them. So, you know, you'd be objecting to his own experts' interpretation of those films. That seems to be the thrust of Mr. Wisora's argument. He recognizes you have evidence on your side of the case. He's going to say, well, it's not just a matter of telling up the number of experts. His fallback position is recognizing the expertise and the credentials of your experts. He's saying, but their opinions are flawed. Therefore, you knock them out because your experts' opinions are flawed. That's the thrust of his argument. What do you have to say to that? The commission decided that. And as I said, we can argue about the facts and who's flawed or not flawed. But they did their job. They decided that and they stated it very clearly. So in regard to the emphysema, since he brought up the emphysema, my bee reader did read a CT and he did find emphysema. And I specifically asked him, was that in a background of opacities and pneumoconiosis? And he said there were no opacities. So what he's got is an emphysema that's central lobular, which is what you get with smoking. If it was due to coal dust exposure, there would have been some background of opacities in that field of emphysema on that CT. Was there any evidence that that was the case from the other side, from other readers? I'm sure there was, yes. But then again, the commission then had all that before them and they made their determination and they gave greater weight to the opinion of Dr. Meyer. So you're characterizing in this case is that, I won't use the term I used yesterday, but that the evidence is so clearly evenly balanced that it's within the province of the commission to, so to speak, put the thumb on the scale. I think I'd be stronger and say that I think the preponderance of the evidence is that he doesn't have pneumoconiosis, but that's not my burden to prove. Clearly, they weighed the evidence and made their determination as to where that balance is. I'm sure Mr. Reshore would like you to acknowledge on the record the evidence is very evenly balanced, but I don't think you're going there, right? No. You declined the invitation? I declined the invitation based upon the evidence. I would argue that a preponderance is in my favor, but that's not my burden. In regards to the other diseases, let's call them that, COPD, emphysema, asthma, again, there was conflicting medical evidence as to whether Mr. Summers had COPD, and if so, its cause. Dr. Hauser said there was an obstruction. Dr. Retscher said there was not. And the commission made their decision. You know, they had to decide here what side was correct, or they had to decide whether the claimant had proven his case about preponderance, and they found that he did not. Isn't that a better way to phrase it? I mean, we're struggling with that. Yeah. We keep talking about it's in their province to choose whatever, but implicitly behind that is, from a legal analysis standpoint, if it is that evenly balanced, that it would support either side, that the real way to describe it is that the claimant has not established and moved the line. That's correct. His or her favor. By preponderance, and I don't. And we tend not to say that. Yeah, we need to say that. You all can help the bar say that. I agree. I'm not saying that we're all. We sometimes, I'm talking about all of us now, get loose with that language. I don't know if I cited in this brief, I may have cited in the one from the case yesterday, the Rittler case, where actually the Supreme Court took that on and just said where the evidence is evenly balanced. And we do have those cases, which in essence means. That's right. Well, we'll just see how it lands, you know, head or tails. That's not a preponderance. And that's what they said in Rittler, and I think that's right. We do have, and I have it, and I didn't bring it. We do have a good definition of preponderance of the evidence, I think, in the Supreme Court of the case. I think it's very well written. Maybe you should put it in black letters somewhere for us all. The commission had conflicting medical evidence as to disease, cause. They resolved that conflict. There's sufficient evidence in the record to support their finding. I don't have anything more to add. I was actually kind of hoping you'd ask me about 19B, because I think if there's an issue here, and it's not an issue in this case, I think it's moot, but I think it would be, that would have been fun to talk about. And I think it's surplusage. I don't think it's of any meaning. I would ask that the court affirm the commission and just state that the issue as to 19B is moot. I don't think we need to go here, although I'd love to talk about it. Yes. I don't have anything more. If you have any questions. I don't believe our court has any further questions. Thank you, counsel. Thank you. Counsel, you may reply. On this balancing evidence, I would tell you that the evidence in this case is less balanced than in almost any case I've seen in 30 years. It's amazing to me the commission came up with a decision they did. And on these NIOSH films, one more thing about this specific set. The most recent NIOSH film of 2005 isn't negative zero, zero. It's negative zero over one, which means that B reader saw signs of pneumoconiosis, just not enough. That used to mean 10 years ago, 15 years ago, we won, because what it would mean is the company says there's nothing there. The B reader from NIOSH says there's something there. We're just talking about how much. And the difference was something versus nothing. So that part is critical. Now, the other thing is when we talk about the finding of. I have a question about that. Back to that example. If there's something, then you prevail. Is that right? Or do you go one step further? I would say in the past, the court would look and say, well, the company says there's nothing there. That's not right. There's something there. The SOARS guys say it's enough to be pneumoconiosis. And it would swing it my way. It's easier to weigh something versus nothing than one over zero versus one over one. And so that used to get us there. And it's kind of tangential, this case, but it's in there. And then on the talking about Dr. Repture and whether he's carried that burden. What do I have to do? I've been able to come up here a few times in the last few years and get a case turned over on a manifest weight argument. But it's never on a frontal assault. It's always coming in from the flank and attacking the basis for that opinion. And that's what I'm doing here. The basis of this opinion is just awful. The reasons that he gives for not paying attention to the authorities are terrible. Saying that the NIOSH and Department of Labor are absolutely insane isn't much of an academic argument in my opinion. But I move on. And another factor is here with Dr. Repture. It came out in this deposition that he had taken the B Reader certification test two times and failed it. And at the time of the exam, he wasn't a B Reader. And then he said, quote, well, I do A readings, but they don't mean anything. They're just out there, but nobody's going to consider them as something of probative value anyway. Right. And there's another piece of literature out there that's kind of new to you. I don't remember arguing this to you before, but you'll hear it a lot of times in the future. The only literature that Repture actually cited was in claimant's favor. He said it's possible that studies have shown that at autopsy, 50% or more of coal miners who did not have pneumoconiosis detected during their life actually had it at the autopsy. 50% or more. Shows you how crude a tool the x-ray is. CWP was also found by Hauser, Graham, Cohen, Smith, Alexander, Patrick Murphy, and in the records of the Warren Clinic. This isn't close. It's not a balanced deal. Now, so I want to back up in what time I've got left here to 30,000 feet and review what happened. Claimant had moved to Tulsa, Oklahoma. That's almost 500 miles west of here. So respondent determined to have its exam done at St. Francis Hospital in Tulsa. But it didn't want to use the pulmonologist in Tulsa. They went that 500 miles to Tulsa and another 700 miles to Eaton Ridge, Colorado, to bring back Dr. Repture, who in all fairness, they had used him in the past. And who is he? Well, he's a pulmonologist with failing eyesight. He took the B-reader test twice and failed it. He's not a B-reader because he can't see. But that's okay because he said, no, he's going to listen to me anyway. Now, I'm sorry, you've obviously aroused our curiosity. How do we know he can't see? He said so. He said, my vision is failing. That's why I can't pass the test. Now, at Tulsa, Dr. Repture's radiologist read the CT scan that Repture ordered for the exam. And he found it to show emphysematous changes. Well, that's not what Repture wanted to hear. So he said, I've never heard of that word. And then he insulted his radiologist. He said, he's making it up. Well, now we know that we have to worry about the eyesight failing and also the memory. Now, the finding of emphysema is so contrary to what Dr. Repture wants to find that he said his own radiologist just made it up. Now, if the authorities are correct, the AMA, the American Thoracic Society, Department of Labor, and NIOSH, that mining is a bad place for smoking, if they're correct, Repture says you can't rule out coal mining as a part of this man's obstruction. I think that's the case, actually, that admission on his part. Because that puts the burden on you. It puts the burden on the commission. Do we want to turn over all the authorities that there are, the governmental and the medical authorities? Because that's what you have to do to deny the case. Thank you. Thank you, Counsel Bowles, for your arguments in this matter this morning. It will be taken under advisement that this position shall issue.